**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**October 30, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

STANLEY LEO WADE,

    Defendant - Appellant.

No. 05-4160
(D.C. No. 2:04-CR-00141-TS)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BEAM,**[**] and **HARTZ**, Circuit Judges.[***]

Defendant-Appellant Stanley L. Wade was convicted of seven charges

relating to tax evasion and bankruptcy fraud, and he was sentenced to 100 months

in prison, 36 months of supervised release, and a fine of $125,000. Mr. Wade

appeals his conviction and sentence, alleging that the district court erred in

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**]The Honorable C. Arlen Beam, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

[***] After examining the briefs and the appellate record, this three-judge panel has decided unanimously to honor the request of the parties to proceed without oral argument. The cause is therefore ordered submitted without oral argument.

several evidentiary rulings, that it improperly instructed the jury, that it permitted the government to make prejudicial arguments in its closing, and that it did not give his attorney a sufficient opportunity to argue mitigation at sentencing. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

## Background

Mr. Wade and his wife, Janet, were charged in a nine-count indictment. Count 1 alleged that the Wades conspired to defraud the IRS by transferring ownership of various apartment complexes into sham entities called "Unincorporated Business Organizations" ("UBOs" or "business trusts") and not reporting the income from them. The indictment alleged that the complexes generated gross rental receipts in excess of $7 million, taxable income of $4 million, and a tax liability of over $1.5 million. The Wades were accused of conspiring to hide ownership of the complexes not only to conceal income and evade tax, but also to conceal a source of payment of an outstanding tax liability from 1982-84 in excess of $1 million. Count 1 also alleged that the Wades conspired to file for bankruptcy fraudulently, with Mr. Wade representing that he had no real property assets. Counts 2-5 charged the Wades with evasion of assessment for tax years 1997-99 and evasion of payment for 1982-84 in violation of 26 U.S.C. § 7201 and 18 U.S.C. § 2. Count 6 alleged that Mr. Wade committed bankruptcy fraud in violation of 18 U.S.C. § 157, and count 8 charged

- 2 -

him with making a false statement in a bankruptcy proceeding in violation of 18 U.S.C. § 152. Counts 7 and 9 alleged the same bankruptcy charges against Mrs. Wade. Mrs. Wade entered a guilty plea, but Mr. Wade elected to stand trial. After a seven-day jury trial in March of 2005, Mr. Wade was convicted on all charges against him.

The parties are familiar with the facts, and we need not restate them here. Instead, we will describe only the facts crucial to our decision on each alleged error.

## Discussion

1. The Attorney-Client Privilege

Mr. Wade first argues that the district court erred by permitting the government to introduce a letter written to him by his attorney, David Black, addressing the legality of using UBOs to shield the income generated by the Wades' apartment complexes from federal taxes. This letter advised that there was "no exemption from reporting or taxation in general that applies to a UBO" and that the IRS was likely to prosecute if the Wades persisted in failing to report income from the properties nominally held by their UBOs. I Aplee. Supp. App. at 27.

In the district court, Mr. Wade sought to bar the government from presenting any evidence about the letter, arguing that it was covered by the

attorney-client privilege. At the suppression hearing, the government offered the testimony of the Wades' nephew, Adam Passey, and Troy Powell, who assisted Mr. Wade in managing the apartment buildings. Both witnesses testified that Mr. Wade had shown them the letter. <u>See</u> III Aplee. Supp. App. at 457, 476.

The district court found that "Mr. and Mrs. Wade, in their individual capacities, were Mr. Black's clients." <u>Id.</u> at 491. It then addressed the disclosure of the attorney-client communication, finding that:

> Mr. Wade disclosed the letter both to Mr. Passey and Mr. Powell. Neither Passey nor Powell were employees or agents of Mr. Wade, but rather the UBOs. . . . Mr. Wade did not need to disclose the contents of the letter in order to ask Mr. Powell to resolve the billing dispute. . . . Mr. Wade's disclosure to Mr. Passey was motivated more by his frustration with the contents of the letter rather than a need for Mr. Passey to know about the letter and its contents. . . . Mr. Passey and Mr. Powell were third parties to the attorney/client relationship between Mr. Black and Mr. and Mrs. Wade.

<u>Id.</u> at 491-92. The court concluded that the letter was privileged but Mr. Wade waived the privilege by disclosing it to Mr. Passey and Mr. Powell. <u>Id.</u> at 492.

We "review a district court's determinations regarding waiver of attorney-client privilege and work-product protection for abuse of discretion. In doing so, however, we review the district court's underlying factual findings for clear error, and its rulings on purely legal questions de novo." <u>Thiessen v. Gen. Elec. Capital Corp.</u>, 267 F.3d 1095, 1112 (10th Cir. 2001) (citations omitted).[1]

---

[1] The government asserts that Mr. Wade has waived this argument by failing to include in the record "the letter, the pretrial motions and memoranda, the hearing transcript, or the court's order." Aplee. Br. at 33. We ordinarily will

- 4 -

The law governing the waiver of the attorney-client privilege provides that "[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party." United States v. Ryans, 903 F.2d 731, 741 n.13 (10th Cir. 1990). Mr. Wade contends that he did not waive the privilege by disclosing the letter to Mr. Powell because "Powell testified that he played an important role in the Defendant's business and that Defendant gave him a copy of the opinion letter as a part of his work." Aplt. Br. at 3. He further contends that Mr. Powell was present during discussions with the attorney and had been instructed to communicate with the attorney about the UBOs. Aplt. Br. at 11. Mr. Wade relies upon Diversified Indus., Inc. v. Meredith, 572 F.2d 596, 610 (8th Cir. 1977), which addressed the extent to which a corporate employee's communications with counsel are protected by the attorney-client privilege.

We have noted that the attorney-client privilege facilitates the client's need for advice and the attorney's need for complete information in rendering that advice. In re Qwest Commc'ns, Int'l, Inc., 450 F.3d 1179, 1185 (10th Cir. 2006). Here, the clients were Mr. and Mrs. Wade, and the opinion letter was

---

not review a decision, even for plain error, where the "relevant portions of the transcript of the trial proceedings are not part of the record on appeal." United States v. Davis, 60 F.3d 1479, 1481 (10th Cir. 1995). Here, however, we elect to review it because the materials provided by the government provide a sufficient basis on which to decide the issue.

drafted at Mrs. Wade's urging. Mr. Powell and Mr. Passey both testified that Mr. Wade talked with them about the UBOs and how he could avoid paying taxes. III Aplee. Supp. App. at 452, 474. Even were we to accept that Mr. Powell assisted Mr. Wade in his ventures and that Mr. Powell's role included assisting Mr. Wade in obtaining legal advice, Mr. Wade does not address the fact that he also disclosed the letter to his nephew, Mr. Passey. See Aplt. Br. at 3 (claiming that the letter "was reviewed *only* by Wade, Janet and Powell") (emphasis added); see also III Aplee. Supp. App. at 491 (district court's remarking that parties agreed letter was disclosed to Mr. Powell and Mr. Passey). This constitutes an independent ground to uphold the district court's ruling, and it is well supported by the record. Mr. Passey testified that anytime Mr. Wade met with his attorneys, he wanted a witness. III Aplee. Supp. App. at 454. Mr. Passey's role as a witness, however, had nothing to do with facilitating attorney-client communications about the UBOs. Id. at 454-55. Thus, Mr. Wade's disclosure of the letter in the process of venting about the quality of the advice he received (and its expense) had no connection with any responsibilities Mr. Passey had to the Wades individually.

2. The Marital Privilege

Mr. Wade next argues that the district court erred by permitting two government witnesses, Mr. Passey and the Wades' accountant, Marvin Haney, to testify about statements they heard Mrs. Wade make to her husband. Mr. Passey

- 6 -

recounted Mrs. Wade's concerns about whether the Wades could afford to pay their taxes and whether the UBOs would protect them from tax liability. Aplt. App. at 62-64. The gist of the statements Mrs. Wade made in Mr. Haney's presence was "you are going to get me put in jail over this." Id. at 51-52.

Mr. Wade objected to the use of these statements, arguing that they were hearsay and privileged marital communications. The district court held a hearing in which it found that the government had established that the Wades were involved in a conspiracy, making Mrs. Wade's statements non-hearsay under Rule 801(d)(2)(E), Fed. R. Evid.[2] I Aplee. Supp. App. at 76-92. However, the government represented that it only intended to offer statements made in the presence of others, which would not be covered by the marital privilege. Aplt. App. at 46. The court granted Mr. Wade's motion to exclude any privileged spousal communications without addressing the admissibility of statements made in the presence of third parties. See id. at 85.

Mr. Wade now claims that the government did, in fact, offer privileged

---

[2] Under Rule 801(d)(2)(E), a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The district court did not explain how statements like "you are going to get me put in jail over this" were made *in furtherance* of the Wades' conspiracy, and we do not think that such statements were in any way intended to promote conspiratorial objectives or facilitate the conspiracy. See United States v. Caro, 965 F.2d 1548, 1557 (10th Cir. 1992). However, any error in their admission was harmless; the statements were non-hearsay because they were not offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Instead, they were offered to show Mr. Wade had notice of the illegality of his actions, rebutting his good-faith defense.

statements and the district court failed to exclude them. The government maintains that Mr. Wade failed to object and our review should be for plain error. See United States v. Ambort, 405 F.3d 1109, 1115 (10th Cir. 2005). Given a proper objection, a trial court's decision not to apply the marital privilege is an evidentiary ruling reviewed for an abuse of discretion. See United States v. Leonard, 439 F.3d 648, 650 (10th Cir. 2006). Whether we review this under the plain error standard or for an abuse of discretion, the outcome is the same.

"Federal courts recognize two marital privileges: the first is the testimonial privilege which permits one spouse to decline to testify against the other during marriage; the second is the marital confidential communications privilege, which either spouse may assert to prevent the other from testifying to confidential communications made during marriage." United States v. Jarvison, 409 F.3d 1221, 1231 (10th Cir. 2005). Here, Mr. Wade argues that the second privilege allows him to prevent his wife's de facto testimony through third party witnesses. He cites no authority for the idea that the marital privilege can keep a third party from testifying about statements made by one spouse to another. However, we need not decide whether Mrs. Wade's statements *could* be covered by the marital privilege, because even if they were eligible, the privilege would not apply in this case.

In Pereira v. United States, the Supreme Court held that "[a]lthough marital communications are presumed to be confidential, that presumption may be

overcome by proof of facts showing that they were not intended to be private."
347 U.S. 1, 6 (1954). Specifically, "[t]he presence of a third party negatives the presumption of privacy." Id. Here, the statements by Mrs. Wade were uttered aloud, often during confrontations between Mr. and Mrs. Wade, in the presence of Mr. Passey and Mr. Haney. We find no error in the admission of the statements, plain or otherwise.

3.    The Confrontation Clause

Mr. Wade also asserts that the district court erred in admitting testimony about statements made by Mrs. Wade and Richard Kennedy, an IRS lawyer, because they were not subject to cross-examination. In addition to recounting the aforementioned statements made by Mrs. Wade, Mr. Passey testified that he told Mr. Wade about a conversation he had with Mr. Kennedy. Mr. Wade's counsel objected on hearsay and relevance grounds, but the court allowed the testimony as evidence of notice. According to Mr. Passey, he told Mr. Wade that:

> I said, Richard, have you ever seen a UBO be used for tax benefit purposes, ever. He says no, I've never seen it, Adam. I've prosecuted and dealt with approximately 65 of these. Every single time they are used for income tax savings and that type of thing, they are always blown away. They never prevail. They are never successful.

Aplt. App. at 60.

Because Mr. Wade did not raise his Confrontation Clause objections at trial, our review is for plain error. United States v. Crockett, 435 F.3d 1305, 1311

(10th Cir. 2006); see also United States v. Gomez, 67 F.3d 1515, 1524 (10th Cir. 1995) ("[T]he failure to object to the admissibility of evidence is a waiver absent plain error.").  Under this standard, we look for (1) an error (2) that is plain and (3) that affected substantial rights; we will reverse only if the error "affected the outcome of the district court proceedings."  United States v. Olano, 507 U.S. 725, 732-34 (1993).

In Crawford v. Washington, the Supreme Court held that the Sixth Amendment requires a trial court to exclude hearsay that is "testimonial" in nature when the defendant has not had the opportunity to cross-examine the declarant.  541 U.S. 36, 68 (2004).  The Court did not precisely define testimonial in Crawford, but it indicated in Davis v. Washington that a statement is testimonial if the "the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution."  126 S. Ct. 2266, 2273-74 (2006); see also United States v. Summers, 414 F.3d 1287, 1302 (10th Cir. 2005) ("[A] statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime.").

Neither Mrs. Wade's nor Mr. Kennedy's statements qualify as "testimonial" under this definition of the term.  Mrs. Wade said she was worried about going to jail, worried about paying the taxes, and worried about going into bankruptcy.

Mr. Kennedy offered observations based on his extensive experience dealing with UBOs. These statements lacked the "formality [that] is indeed essential to testimonial utterance," Davis, 126 S. Ct. at 2278 n.5 (2006), and the circumstances do not indicate that they were likely to be used in the investigation or prosecution of a crime. Mr. Passey and Mr. Haney were not government agents or even private investigators. They were not adverse to the Wades in any way. Indeed, Mr. Passey testified that his intent in questioning Mr. Kennedy was to obtain statements he could communicate to Mr. Wade in order to help him *avoid* prosecution. See Aplt. App. at 57 ("I needed to speak to someone in the IRS because if I could get the information, maybe I could take it to [my] family member and get him not to do something which could very well–was probably illegal.").

In any case, the statements were not testimonial because they were not offered for their truth. We have held that "[o]ne thing that is clear from Crawford is that the [Confrontation] Clause has no role unless the challenged out-of-court statement is offered for the truth of the matter asserted in the statement." United States v. Faulkner, 439 F.3d 1221, 1226 (10th Cir. 2006). Here, Mrs. Wade complained that her husband was "going to get me put in jail over this." Aplt. App. at 52. As Mr. Wade concedes, his wife's statements were circumstantial evidence offered to show that he "intended to commit the crimes for which he was convicted." Aplt. Br. at 9. Similarly, Mr. Kennedy's statement was not offered

for the truth of whether Mr. Kennedy had *actually* never seen a successful attempt to use a UBO to shield income; it was offered to show that Mr. Wade was aware that he should have reported income from the UBOs but that he willfully chose not to do so. Both witnesses' statements were offered to prove notice, and, as such, their use did not implicate the Confrontation Clause.

In short, we conclude that these statements were non-testimonial, and thus it was not error, plain or otherwise, to admit them.

4.    Mr. Wade's Affidavit

Mr. Wade argues that the district court erred in admitting an affidavit he signed in connection with a state court lawsuit that was litigated shortly before his criminal trial began. In this affidavit, the Wades and their two sons affirmed that they "or certain trusts or business entities legally or equitably owned by" them owned the properties held by one of the UBOs at issue here. Aplt. App. at 191.

Mr. Wade objected to the affidavit, arguing that it lacked an adequate foundation and was unduly prejudicial because it was confusing. Id. at 183. To authenticate the affidavit, the government was prepared to call John Mullen, an attorney who represented the opposing party in the Wades' lawsuit. The parties presented a stipulated proffer of Mr. Mullen's testimony, which described the nature of the lawsuit and identified the affidavit as the one that the Wade family filed. Id. at 188-89. Following the proffer, the court asked if the stipulation

included "the admission of [the affidavit] in a redacted form" and Mr. Wade's counsel replied, "[s]ubject to prior discussions with the Court." Id. at 189-90.

Mr. Wade first contends that the affidavit should have been excluded because it was irrelevant. We review this ground for plain error because it was not part of Mr. Wade's objection at trial. Under Rule 401, relevant evidence "means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence." Fed. R. Evid. 401. Mr. Wade was charged with failing to list the UBOs among his assets during his bankruptcy; thus, his subsequent sworn admission that he and his family were the equitable or legal owners of one of the UBOs is highly probative of whether he committed bankruptcy fraud. Admitting it was not plain error.

Mr. Wade also argues that the affidavit should have been excluded because it was unduly prejudicial. We review this ground for an abuse of discretion because it was raised at trial. Aplt. App. at 183-84. Mr. Wade contends that the affidavit was misleading and that it "suggested that [he] was engaged in ongoing criminal activity." Aplt. Br. at 20. Under Rule 403, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Fed. R. Evid. 403. The district court concluded that the affidavit had "substantial probative value," Aplt. App. at 184, and we agree. Not only was the affidavit relevant to

the bankruptcy fraud charges, it was probative of whether the income from the entities Mr. Wade claimed to own should have been included on his tax returns. On the other hand, Mr. Wade argues that the affidavit was prejudicial because it was signed as the statement of all four members of the Wade family, not Mr. Wade alone, and that it could have been confusing because it required the parties to educate the jury about the facts and claims in the state court civil suit. Without doubt, these are valid concerns. However, given that the affidavit went to the heart of several of the charges against Mr. Wade and was a recent sworn statement signed by him, we cannot say that the danger for prejudice substantially outweighed its probative value. Mr. Wade had an opportunity to explain the circumstances of the affidavit to the jury. Aplt. App. at 255-56. The district court did not abuse its discretion in admitting it.

5.    Mr. Hunter's Testimony

In his defense, Mr. Wade called Daniel Hunter, an attorney and CPA who began representing him in 1998. Mr. Wade now argues that the district court erred in three rulings limiting Mr. Hunter's testimony. We review the decision to admit or exclude evidence for an abuse of discretion. Leonard, 439 F.3d at 650.

(a) Mr. Hunter's 1998 Advice to Mr. Wade

Mr. Wade's attorney questioned Mr. Hunter about discussions he had with Mr. Wade concerning tax shielding. See Aplt. App. at 201-02. The government objected that the conversations were irrelevant because the UBOs were created in

- 14 -

1992, six years before Mr. Hunter began representing Mr. Wade. The district court sustained the objection, and Mr. Wade's counsel made the following proffer: "This advice was given before the filing of the bankruptcy and it would have an effect on conduct the government here charges to be criminal[:] . . . his state of mind at that time." Id. at 201. The court replied: "For that limited purpose, I'll allow you to continue." Id.

Mr. Wade now argues that the district court abused its discretion in limiting Mr. Hunter's testimony. However, the district court admitted the testimony for precisely the reason his attorney claimed to be offering it. Mr. Wade's brief does not explain why this limitation was an error or how else the testimony could have been used. He also fails to explain how the limitation was prejudicial. We believe that the limitation was entirely reasonable in light of the proffer made by Mr. Wade's counsel, and we consequently find no abuse of discretion.

(b) Mr. Hunter's Opinion of Mr. Wade's Level of Sophistication

Mr. Wade next argues that the court erred in preventing Mr. Hunter from giving his opinion of Mr. Wade's level of sophistication in the area of grantor trusts. Under Rule 701, a lay witness's testimony "in the form of opinions . . . is limited to those opinions . . . which are (a) rationally based on the perception of the witness, [and] (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue . . . ." Fed. R. Evid. 701. The government contends that Mr. Hunter's opinion was inadmissible under Rule 701(b) because it

was not helpful in understanding his testimony.[3]  Mr. Hunter had already testified

that the grantor trust rules in relation to revocable and irrevocable trusts are so

complicated that an ordinary layperson (and even an attorney or CPA without

experience) would not understand them upon reading them.  See Aplt. App. at

203-04.  We agree that Mr. Hunter's opinion of Mr. Wade would have added little

to clarify those statements; the jury could apply Mr. Hunter's testimony to Mr.

Wade and reach its own conclusion.  The district court did not abuse its

discretion.

(c) Mr. Hunter's Attempts to Settle Mr. Wade's Tax Debt With the IRS

Mr. Wade contends that the court erred in excluding testimony by Mr.

Hunter and himself concerning attempts to settle his tax debt with the IRS.  He

argues that:

> *Wade* would have testified that the IRS was not interested in settling,
> that he intended to make a $2 million tax payment, and that he was
> willing to cooperate with a diversion agreement.  All of this was
> relevant and admissible regarding Defendant's state of mind and
> willfulness as to all charges.

Aplt. Br. at 22 (emphasis added).  Significantly, Mr. Wade offers no arguments

about what *Mr. Hunter* would have said or how that would have been relevant and

admissible.  Moreover, we fail to see how the attempts to settle the tax debt after

---

[3]  Of course, lay opinion testimony may also be used if it is "helpful to . . . the determination of a fact in issue."  Fed. R. Evid. 701(b).  Mr. Wade does not make this argument, so we need not consider whether the opinion could have been admitted for this reason.

the charged offenses are relevant to his conduct beforehand. We find no error.

6.    Mr. Roberts's Testimony

Mr. Wade next argues that the district court improperly permitted Steven Roberts, a revenue agent, to testify against him as an expert summary witness. Mr. Wade's objections to Mr. Roberts's testimony may be grouped into three categories: (1) Mr. Roberts testified about the law, which is impermissible under Rule 702, Fed. R. Evid.; (2) Mr. Roberts misstated the law in his testimony, prejudicing the defendant and confusing the jury; and (3) Mr. Roberts implied that Mr. Wade acted willfully, and an expert opinion about the defendant's mental state is forbidden by Rules 702 and 704(b), Fed. R. Evid.

Mr. Wade contends that Mr. Roberts's testimony went beyond the permissible scope of expert testimony because he "state[d] legal conclusions by applying the law to the facts . . . ." Aplt. Reply Br. at 4. Specifically, he argues that it was improper for Mr. Roberts to testify that (1) the income was reportable under the grantor trust rules because of the attributes of ownership maintained, (2) the attributes of ownership included "control," (3) the Wades should have reported rental income from the UBOs on their income tax returns because the trusts operated businesses, and (4) the rental income was taxable to the Wades because the UBOs were shams. We note that Mr. Wade did not object to much of what he finds fault with here, suggesting that a plain error review is appropriate.

- 17 -

Crockett, 435 F.3d at 1311.[4]

As an initial matter, any expert must be qualified and his testimony must be reliable, but Mr. Wade did not object on those grounds. See United States v. Pree, 408 F.3d 855, 870 (7th Cir. 2005). Substantively, "[w]hile testimony on ultimate facts is authorized under Rule 704 . . . testimony on ultimate questions of law is not favored [because it] . . . circumvents the jury's decision-making function by telling it how to decide the case." Specht v. Jensen, 853 F.2d 805, 808 (10th Cir. 1988) (en banc). However, "[w]e do not exclude all testimony regarding legal issues. We recognize that a witness may refer to the law in expressing an opinion without that reference rendering the testimony inadmissible. Indeed, a witness may properly be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms." Id. at 809. The crucial distinction lies between "discoursing broadly over the entire range of the applicable law," which is improper, and "focus[ing] on a specific question of fact," which is permissible. Id.

_____

[4] Mr. Wade's counsel did object on the grounds that mere control of property transferred into an entity is not enough to make it a grantor trust. IV Aplee. App. at 515. The district court overruled the objection, and the next question by the prosecutor dealt with the specific facts of this case and whether the UBOs were grantor trusts. Id. at 516. Mr. Roberts responded that they were, but that it would not be his primary audit position. Id. For reasons explained below, we conclude that the district court did not err in permitting this testimony; thus, it did not abuse its discretion in overruling the objection.

In Specht, we concluded that it was error to allow a lawyer to testify as an expert about the legality of searches. This testimony "painstakingly developed over an entire day the conclusion that defendants violated plaintiffs' constitutional rights" using a series of hypothetical situations to illustrate when consent was validly given, when it was unnecessary, and when individual officers could be held liable under 42 U.S.C. § 1983. Id. at 806-08. In the wake of Specht, we have prohibited evidence that purely addresses questions of law. See, e.g., United States v. Willie, 941 F.2d 1384, 1396 (10th Cir. 1991) (refusing to allow a judicial opinion as evidence that the defendant's tax position was taken in good faith). On the other hand, we have allowed experts to apply the law to the facts to reach a discrete legal conclusion relevant to the case. See, e.g., United States v. Dazey, 403 F.3d 1147, 1172 (10th Cir. 2005) (allowing Federal Reserve bank fraud expert's opinion that the scheme at issue was a "prime bank fraud" because "[e]ven if his testimony arguably embraced the ultimate issue, such testimony is permissible as long as the expert's testimony assists, rather than supplants, the jury's judgment"); see also Specht, 853 F.2d at 809 ("[A] court may permit an expert to testify that a certain weapon had to be registered with the Bureau of Alcohol, Tobacco, and Firearms.").

We have not specifically addressed the scope of permissible testimony by an IRS witness acting as an expert, but other courts have. In United States v. Windfelder, the Seventh Circuit upheld the admission of testimony by IRS agents

about the tax treatment of certain transferred assets, and it concluded that, although the admission of other testimony (that a defendant intentionally understated his income and was well aware of what happened to other assets) was error, the error was harmless given overwhelming evidence of guilt. 790 F.2d 576, 582 (7th Cir. 1986). The court held, and we agree, that a properly qualified IRS agent may analyze a transaction and give expert testimony about its tax consequences but may not express an opinion about the defendant's state of mind at the time of the transaction. Id. at 581-82; see also United States v. Mikutowicz, 365 F.3d 65, 72 (1st Cir. 2004). Some of that testimony necessarily will include the agent's understanding of the applicable law as a backdrop to explaining how the government analyzed the transaction.

In light of these considerations, we conclude that the district court did not err in allowing Mr. Roberts's testimony. Although he reached legal conclusions, he did so only after explaining his understanding of the relevant law and then applying the facts as he understood them. His conclusions were presented as opinions rather than unquestionable facts. Mr. Roberts was cross-examined about the bases for his conclusions, and the trial court gave specific instructions that his testimony was expert opinion and that it was up to the jurors whether they wanted to credit all of it, none of it, or parts of it. III Aplee. Supp. App. at 417, 422-23.

Mr. Wade also objects to the substance of Mr. Roberts' testimony, contending that parts of it were inaccurate or incomplete. Mr. Roberts necessarily

testified about entity taxation and transactions that have economic substance. He explained in layman's terms that the income from the UBOs must be reported somewhere, asserting his primary position that the UBO was an association or proprietorship and that the income should have been reported on the Wades' personal returns. IV Aplee. Supp. App. at 518. He further testified that his secondary position was that the businesses were grantor trusts, and that such trusts could file as corporations, partnerships, or proprietorships, depending upon the circumstances. Id. at 517. Although Mr. Wade argues that Mr. Roberts took too limited a view, failing to acknowledge the possibility of corporate filing status, this is really beside the point: *Mr. Wade did not elect corporate status and never filed corporate tax returns for the UBOs*.

Mr. Wade also argues that Mr. Roberts spoke incorrectly when he indicated that a trust will be deemed a grantor trust if the grantor retains "control" or "ownership." Although the testimony might not cover every situation, Mr. Roberts was using lay terms against the backdrop of what occurred here to refer to the power to control the disposition of "the beneficial enjoyment of the corpus or the income therefrom" under I.R.C. § 674(a). See Aplt. App. at 103 ("Q: What attributes of ownership would you be talking about there? A: Being able to receive the income and determine what happens to it. Being able to . . . do whatever they want with the property . . . .").

Finally, Mr. Wade argues that Mr. Roberts's definition of a sham was

incomplete. Mr. Roberts testified that a sham is "an arrangement that has been set up that really lacks economic substance." Aplt. App. at 109. In response, Mr. Wade offers our language from Bohrer v. Commissioner:

> [A] transaction will be accorded tax recognition only if it has economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax avoidance features that have meaningless labels attached.

945 F.2d 344, 347-48 (10th Cir. 1991) (internal quotation marks omitted). Given this definition, we do not believe that Mr. Roberts's statement is inaccurate or incomplete. The quoted language offers a *definition* of economic substance, but it does nothing to displace the accuracy of the assertion that a sham is an arrangement that lacks economic substance. Mr. Roberts was testifying to practical application of the tax laws, not authoring a treatise.

Moreover, we reject Mr. Wade's contention that Mr. Roberts gave impermissible opinion testimony about Mr. Wade's state of mind by repeatedly using the term "sham." Aplt. Reply Br. at 5-7. While an objection to the repeated use of the word "sham" might have been well taken, it was not made, and we do not think that Mr. Roberts crossed the line to impermissible state-of-mind testimony. The district court's decision to allow his testimony was not error.

7.    The Proposed Jury Instruction

Mr. Wade also contends that the district court erred in refusing to give one

of his proposed jury instructions.[5]  At the jury instruction conference, Mr. Wade's

---

[5]  The instruction provided:

The evidence in this case establishes that the individual income tax returns filed by Stanley and Janet Wade for the years 1991 through 2001 were prepared by Marvin Haney.  Mr. Haney also prepared certain corporate income tax returns for AP Construction, Inc., Wade Properties, Inc., and for various corporations, including Cherry Hills Apts., Inc., Del Monico Apts., Inc., El Caliente Apts., Inc., Hillrise Apts., Inc., La Parisenne Apts., Inc., Sade Apts., Inc., and Shangri-La, Apts., Inc.

Mr. Haney is an account [sic] who prepares federal income tax returns for compensation.  As such, Mr. Haney is a "tax return preparer" as that term is defined in the Internal Revenue Code.  Under the Internal Revenue Code, a tax return preparer may not give tax advice, or prepare and sign a return unless he believes that the tax reporting positions have a realistic possibility of being sustained if challenged by the Internal Revenue Service.  This means that the tax return preparer must believe that the tax advice he is giving and the tax returns that he is preparing are supportable by a least a one-in-three possibility of success if challenged by the Internal Revenue Service.  Thus, a return preparer may properly give advice, prepare and sign a tax return that he or she believes is likely to be wrong if challenged.

The reporting standard applied to a return preparer is higher than that which is applied to a taxpayer.  To file a lawful tax return, the taxpayer's position need only have a "reasonable basis."  A reasonable basis position is one which is "arguable" and not patently frivolous.  A taxpayer may, therefore, lawfully take tax reporting positions which are highly likely to be wrong if challenged by the Internal Revenue Service.

Therefore, the Government must prove beyond a reasonable doubt that the Defendant, Stanley L. Wade, did not believe in good faith that his tax reporting position was arguable.  If the prosecution does not prove this to your satisfaction, beyond a reasonable doubt, then you should find the Defendant not guilty.

counsel stated: "I would like this charge in order to make . . . clear to the jury that just aggressive conduct by itself is not sufficient with respect to the act of taking a tax position itself." IV Aplee. Supp. App. at 649. The court sustained the government's objection, explaining:

> I believe that it would be extremely confusing to the jury. I believe it states a position on the law that the Court is not convinced is the law, maybe IRS practice, but that does not constitute the law. I think you have every opportunity in closing to make your point about Mr. Haney's role. . . . An instruction of a sort contemplated by No. 37 would add nothing to the jury's understanding that would help them make the decision that they have to make.

Id. at 652.

"We review for abuse of discretion a district court's refusal to give a particular instruction. In doing so, we also consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." United States v. Serrata, 425 F.3d 886, 898 (10th Cir. 2005) (quoting Bangert Bros. Const. Co. v. Kiewit W. Co., 310 F.3d 1278, 1287 (10th Cir. 2002)). We agree with the district court that the instruction–attempting to define negligence that might result in penalties for a tax return preparer not charged with any wrongdoing and negligence that might result in a penalty for a taxpayer, I.R.C. §§ 6662, 6694–was confusing and only minimally relevant to the criminal charges in this case. Here, the jury was adequately instructed that Mr. Wade's "conduct is not willful if you find that he failed to pay his income taxes because

Aplt. App. at 225-226.

of *negligence*, inadvertence, accident, or reckless disregard for the requirements of the law, or due to his good faith misunderstanding of the requirements of the law." III Aplee. Supp. App. at 400 (emphasis added). The court also instructed that good faith was a complete defense. Id. at 415. These instructions addressed Mr. Wade's concerns and properly stated the governing law. Thus, we conclude that the district court did not abuse its discretion in refusing to give Mr. Wade's proposed instruction.

8.    The Objections to the Government's Closing Argument

Mr. Wade next asserts that the district court erred by allowing the government to make prejudicial statements in its closing argument to the jury. During the closing, Mr. Wade's counsel registered several objections, some of which were sustained and others of which were overruled. On appeal, he points to additional statements by the government that he believes his counsel should have objected to but did not. He argues that the cumulative effect of all the statements was sufficiently prejudicial to warrant a new trial.

Where the trial court overrules an objection to a closing argument, we review for abuse of discretion. United States v. Kravchuk, 335 F.3d 1147, 1153 (10th Cir. 2003). This requires a two-step analysis: "First, we decide whether the conduct was improper. Second, we decide whether the conduct, if improper, warrants reversal." Id. (internal citation omitted). In making our inquiry, we bear in mind that "a criminal conviction is not to be lightly overturned on the

basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985).

Of the statements raised in this appeal, only one was the subject of an objection that was overruled. In reviewing, we must first consider whether it was inappropriate for the prosecutor to state:

> We know that they got in a dispute over rents, and this man [Mr. Wade] had a receiver appointed to guard that trust. You know we heard the evidence elicited by [Mr. Wade's attorney] about trusts, a trustee to conserve and to protect the assets of the trust. So they have a receiver who was a lawyer or an accountant, I'm sorry, a CPA named Gil Miller who is with PriceWaterhouse accounting firm, one of the most famous accounting firms in the country.

Aplt. App. at 294. Mr. Wade objected on the grounds that this information was outside the record. The district court overruled the objection because it was part of the proffered testimony of John Mullen, the defense attorney in Mr. Wade's civil lawsuit. That proffer stated:

> [I]f he were called to testify, [Mr. Mullen] would testify that he represented Don Taylor, who . . . was appointed as the trustee of Wade Management UBO . . . . The case involved a dispute as between Don Taylor, the trustee, and the Wade family over who should have control over the rent collection of the UBO property that we're dealing with in this case.
> Mr. Mullen . . ., on behalf of the trustee, asked to have and indeed [had] a receiver appointed to control those collections. That receiver was an accountant with the firm of PriceWaterhouse and his name was Gil Miller.

Id. at 188. Thus, the court did not abuse its discretion in overruling the objection.

Mr. Wade's attorney also made two objections that were sustained during the closing. The first followed this argument by government:

> Members of the jury, I think it's important probably here for just a minute to talk about the very brief context we have for this [state court civil] suit. Do you see what happened? As it was recited in the proffer, Mr. Wade appointed a man named Don Taylor to act as trustee for Wade Management UBO. Then a horrible thing happened to Mr. Wade, Mr. Don Taylor started to act like a real trustee. He started to worry about the rents.

Id. at 293-94. When Mr. Wade's counsel objected on the grounds of hearsay and lack of evidence, the court sustained the objection. Id. at 294.

Later, the government turned its attention to Mr. Haney, Mr. Wade's accountant. It stated:

> [I]f you just think about the facts surrounding [Mr. Haney], and you saw him, I mean he doesn't–you can make your own judgments about him, but he operates out of his house. He doesn't have a big office like Mr. Steorts or Mr. Black. He is in deep trouble. Why is he in deep trouble? Because he's fresh out of jail and Mr. Wade–

Id. at 299. Mr. Wade's attorney again objected, and the court sustained the objection because "[t]here is no evidence about him being in trouble . . . ."[6] Id.

Mr. Wade's attorney did not object to the other snippets of testimony that Mr. Wade raises in this appeal. He claims that the statement "Mr. Wade can't take it because he cannot have that sham treated as real" was prejudicial. Aplt.

_____

[6] Somewhat troubling in the government's argument is the notion that the location of where professional services are rendered is indicative of their legitimacy and quality.

App. at 294. He also objects to the characterization of Mr. Haney–a prosecution witness–as "that old stock fraud artist," id. at 298, who was "fresh out of jail," id. at 299. Mr. Wade asserts that these statements, when considered together with those to which his attorney did object, "went beyond allowable limits of advocacy . . . affecting the Defendant's substantial rights to due process." Aplt. Br. at 24.

Where counsel fails to object to a statement made during a closing statement, we review for plain error. United States v. Dazey, 403 F.3d 1147, 1170 (10th Cir. 2005). In so doing, we must consider the comments in "the context of the entire case." United States v. Hernandez-Muniz, 170 F.3d 1007, 1011 (10th Cir. 1999). To warrant reversal, the plain error "must be so egregious as to result in a miscarriage of justice." Id. (internal quotation marks omitted).

The statement "Mr. Wade can't take it because he cannot have that sham treated as real" is improper to the extent it is construed as a personal attack on Mr. Wade, but the surrounding comments make it clear that the prosecutor was pointing out the inconsistent positions concerning the UBOs that Mr. Wade was forced to take. Moreover, the government's entire case was that the UBOs were sham entities, designed to defraud the IRS and later his bankruptcy creditors.

On the other hand, the government's statements characterizing Mr. Haney as a "stock fraud artist" and claiming Mr. Haney was "in big trouble" were improper. Although he was a prosecution witness, Mr. Haney was hired by Mr. Wade, and Mr. Wade was understandably concerned that their business

- 28 -

association could have affected the jury's perception of him. We do not, however, think that these statements resulted in reversible plain error when considered in light of the entire record and the overwhelming evidence of guilt therein. Mr. Haney's felony conviction for securities fraud was already in evidence. The statement that he was fresh out of jail was the subject of an objection that was sustained, and the court reminded the jury that there was no evidence that Mr. Haney was in trouble. Aplt. App. at 299. That was sufficient.

9.     Mr. Wade's Sentencing

Finally, Mr. Wade asserts that his attorney was not given enough time to present his sentencing arguments to the district court. Rule 32(I) requires that the sentencing court must "provide the defendant's attorney an opportunity to speak on the defendant's behalf . . . [and] permit the defendant to speak or present any information to mitigate the sentence . . . ." Fed. R. Crim. P. 32(i)(4)(A). Here, the district court allowed both Mr. Wade and his attorney, Randall Gaither, to speak. Mr. Wade contends that the district court violated Rule 32 by stopping Mr. Gaither after an hour and a half of argument and then denying his motion to allow more time to address the court or to continue the hearing. He argues that most of the first hour and a half was spent making objections to the presentence report ("PSR") as permitted by Rule 32(i)(1)(C) and that the ten minutes allowed for the downward departure motion was insufficient under Rule 32(i)(4)(A). See Aplt. Reply Br. at 15.

We review the district court's decision to limit an attorney's opportunity to address the court pursuant to Rule 32(i)(4)(A) for an abuse of discretion. It is well established that a district court may place reasonable limits on the amount of time for allocution by the defendant consistent with Rule 32. See, e.g., Ashe v. North Carolina, 586 F.2d 334, 336-37 (4th Cir. 1978) ("This is not to say that a defendant's right to address the sentencing court is unlimited. The exercise of his right may be limited both as to duration and as to content. He need be given no more than a reasonable time . . . ."). Likewise, we believe Rule 32 permits reasonable limitations on the time given to counsel to address the court at sentencing.

The court noted early on that it had read the considerable material filed by the defense and advised Mr. Gaither to "spend some time on those matters that are going to determine or decide whether or not your client serves and how long." Aplt. App. at 310. After allowing Mr. Gaither to argue sixteen more objections to the PSR, the court gave him ten minutes to argue his motion for downward departure, which had also been fully briefed. Mr. Gaither sought additional time or a continuance to address various sentencing factors, but his request was denied. After Mr. Wade was given "as long as he would like" to address the court, id. at 354, the court imposed sentence.

It is significant that Mr. Gaither was given multiple opportunities to address the court orally and in writing and that Mr. Wade had unlimited time to

speak. Moreover, Mr. Wade points to nothing that Mr. Gaither planned to say that might have affected his sentence. On these facts, we find no abuse of discretion.

Mr. Wade advances three further arguments. He first contends that the district court applied the Sentencing Guidelines in a mandatory fashion, violating United States v. Booker, 543 U.S. 220 (2005). However, the court explicitly stated at sentencing that "it is clear that under Booker and subsequent case law, while the Sentencing Guidelines are now advisory, a sentencing court must consider the guideline calculations in determining what is ultimately a reasonable sentence . . . ." Aplt. App. at 335. Mr. Wade also asserts that the district court calculated his sentence based upon factual findings not made by the jury in violation of Blakely v. Washington, 542 U.S. 296 (2004). Under Booker, judicial factfinding is entirely permissible as long as the guidelines are not applied as mandatory. 543 U.S. at 233; see also United States v. Visinaiz, 428 F.3d 1300, 1316 (10th Cir. 2005). Here, the district court properly recognized that the guidelines are advisory, so no constitutional violation occurred.

Finally, Mr. Wade contends that the district court erred by declining to consider mitigating evidence at sentencing. Aplt. Br. at 29. Specifically, he argues that the district court was required to consider "the nature and circumstances of the offense, the history and characteristics of [the] defendant, and the need for the sentence in light of sentencing purposes," Aplt. Br. at 28

- 31 -

(citing 18 U.S.C. § 3553(a)), as well as a laundry list of other factors from U.S.S.G. §§ 5H1.1-5H1.12.  We have held that a district court need not "march through" every factor it considers in arriving at a reasonable sentence.  United States v. Rines, 419 F.3d 1104, 1107 (10th Cir. 2005).  Here, it is apparent that the court carefully considered several pertinent factors, and Mr. Wade has not demonstrated that the court failed to consider others, let alone that any factor not considered would have affected his sentence.  Aplt. App. at 361-65.

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge